FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

03 AUG 28  AM 8: 44

U.S. DISTRICT COURT
N.D. OF ALABAMA

BONNIE CARROLL,                    )
                                   )
          Plaintiff,               )
                                   )
v.                                 )    Case No. CV-02-TMP-1086-NW
                                   )
KEMPER NATIONAL SERVICES, INC.,    )
et al.,                            )
                                   )    **ENTERED**
          Defendant.               )    AUG 2 8 2003

**MEMORANDUM OPINION**

This cause is before the court on the motion for summary judgment filed by the defendants, Kemper National Services, Inc. ("Kemper"), BellSouth Long Term Disability Plan for Non-Salaried Employees, and BellSouth Short Term Disability Plan (collectively "BellSouth"), on February 7, 2003, and the cross-motion for summary judgment filed the same day by the plaintiff, Bonnie Carroll. The matter has been briefed by both parties, and both have submitted evidence in support of their positions. The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c); accordingly, the court enters this memorandum opinion.



## I. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own

2

affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether

3

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  FACTS

Plaintiff Bonnie Carroll asserts claims arising from the denial of her application for benefits under both BellSouth's short term and long term disability plans in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Carroll is an insured under two group welfare benefit plans available through her former employer, BellSouth, the short term disability plan ("STD") and the long term disability plan ("LTD"). In order to be eligible for consideration for benefits under the long term disability plan, the employee must have been covered by the short term plan for at least 52 weeks.

For purposes of deciding the defendants' motion for summary judgment, the following facts are considered to be undisputed. These facts have been drawn from the evidence in a light most favorable to the non-moving plaintiff. Upon consideration of the plaintiff's cross-motion for summary judgment, the court has evaluated the evidence in a light most favorable to defendants.

### A.  BellSouth's Disability Plans

Under BellSouth's short term disability plan ("STD"), BellSouth is the plan administrator, but the day-to-day responsibility for administering the plan is delegated to employee

5

benefits committees in each of the participating companies.[1]  Those committees further delegated responsibility for administering claims to defendant Kemper National Services, Inc., ("Kemper"). Kemper served as the plan's fiduciary with express authority to review all claims, to determine the eligibility of participants for plan benefits, and to use discretion to construe the plan terms. Under the long term disability plan ("LTD"), Kemper was designated as the fiduciary with authority to grant or deny initial claims for benefits and to handle the appeals of those decisions.  BellSouth provided instruction as to the method and manner that claims would be administered and required that Kemper follow the written claim review instructions provided by BellSouth.   If Kemper violated BellSouth's specific instructions, Kemper was responsible for damages from any loss that resulted from a violation.  As part of its agreement with BellSouth, Kemper expressly agreed to adjudicate claims and appeals in accordance with the written claim review procedures promulgated by BellSouth.  Kemper promoted its services to BellSouth as a method by which the company could reduce the amount paid in disability benefits, and boasted that Kemper

---

[1] BellSouth's plans cover the employees of several affiliated companies, such as BellSouth Telecommunications, Inc.; BellSouth Communication Systems, Inc.; BellSouth Business Systems, Inc.; BellSouth Corporation; BellSouth, D.C., Inc.; and BellSouth Advertising & Publishing Corporation.

promotes a speedy return-to-work plan for employees who qualify for short-term disability benefits.

The summary plan description of the STD provides that an employee of BellSouth is eligible for short term disability benefits after he or she has completed six months of credited service and:

> You are disabled and unable to perform any type work as a result of a physical or mental illness or an accidental injury. Any type work includes your regular job with or without accommodations, any other participating company job (regardless of availability) with or without accommodations, or temporary modified duties.

(Plaintiff's Exhibit 2, p. 1).  The actual plan document itself similarly defines disability as follows:

> "Disability" means a medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury.  "Any type of work" includes the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties.  "A Participating Company job" is any job within a Participating Company; or any job outside a Participating Company which is comparable in skills and function.  A Participant subject to a Disability is referred to as being "Disabled."

(Plaintiff's Exhibit 3, p. 2).

7

Under the LTD plan, a participant becomes eligible only after he or she has been approved for and has received benefits under the STD plan for 52 weeks and he or she still is disabled.  The plan document states:

> "Disability" means a physical or mental illness, whether work related or non work related which makes a participant who has been covered under the Short Term Disability Plan for 52 weeks, unable to perform any type of work other then one which pays less than half of his base pay at the time his benefits under the Short Term Disability Plan began.  Effective January 1, 1993, for purposes of the definition of "disability" a participating earning potential shall be determined using potential jobs in the community.  The earning test shall take into account a participant's functional capacities, background (education, training, work experience), transferable skills, and the participant's age.  The geographic area search for jobs will be within a 35 mile radius of a participant's home and/or prior work location.  A participant subject to a disability is referred to as "disabled."

(Plaintiff's brief, page 5.)

Both the STD and LTD plans are self-funded by BellSouth. Benefits are paid from BellSouth revenues.  There is no established trust fund or pool of monies for payment of benefits.  Benefits are not denied because the funds have been exhausted, as funds apparently exist so long as BellSouth continues its operation as a viable business.

8

B.  Carroll's History

Carroll was employed by BellSouth Corporation and/or BellSouth Telecommunications in 1977.  After 23 years of service,  Carroll stopped reporting to work at her job as a customer service representative at BellSouth on June 9, 2000.  Carroll's supervisor, Monica Bevis, notified Kemper of Carroll's absence on June 14, 2000, in accordance with the STD plan.  Kemper Case Manager Adam Glassman, on June 19, 2000, notified Carroll that her STD plan was based upon disability from "all work (including modified or light duty) due to sickness or injury."  Glassman further told Carroll that BellSouth would provide temporary modified duty as plaintiff recuperated, in accordance with her doctor's orders.

On June 25, 2000, Kemper notified Carroll that her STD benefits were being denied because Kemper had not received any doctor's records that would support Carroll's claim that she was unable to perform any type of work.  Carroll also was informed of Kemper's appeal procedure.  Later that same day, Kemper received records from Carroll's doctor, Darin Bowling, which indicated that Carroll had complained of migraine headaches since July 1999, and was treated for a sinus infection and head tremors in May 2000. Carroll was given an EEG and an MRI on May 20, 2000.  The EEG was reported as within normal limits, and the MRI showed some abnormalities that "may be associated with vascular, migrainous

9

headaches" or "chronic microvascular ischemic changes or demyelinating disease." Dr. Bowling concluded that plaintiff was unable to work, with or without restrictions.

Kemper also received a report from Olivia Gibson, a licensed professional counselor, on June 23, 2000, which stated that Carroll was experiencing depression, anxiety, sadness, fatigue, irritability, excessive worry, trembling, shortness or breath, and a lack of coping skills. Gibson's findings were based on observation and plaintiff's complaints. Gibson had instructed Carroll not to return to work after June 8, 2000, and had determined that a return to work would be dictated by the findings of a neurologist.

Kemper concluded that Carroll had not provided sufficient objective evidence that she was unable to perform any type of work. Kemper concluded that the STD required a showing that Carroll was unable to perform any work of any type. Kemper notified Carroll on June 26, 2000, that her claim for benefits under the STD plan was denied, and that she had 60 days in which to appeal that determination. On July 6, 2000, Kemper received more records from Dr. Bowling, but Kemper determined that no additional information was contained in the records and, on July 7, 2000, Kemper notified Carroll that its original denial would stand. On July 11, 2000, Carroll filed an appeal.

10

On July 20, 2000, Carroll submitted a request for leave pursuant to the Family and Medical Leave Act ("FMLA") for June 9, 2000, until August 31, 2000.  The request was supported by a certification from Dr. Rao Nadella, a neurologist, that Carroll had a serious health condition that qualified her for FMLA leave. Carroll's mother also sent a letter to Kemper, informing Kemper that Carroll could not comprehend information that she read because of her medical problems.

On July 31, 2000, Gibson[2] sent a letter to Kemper, describing plaintiff as experiencing a "mood disorder" with "major depressive-like episodes."  Gibson described an unsteady gait, tremors of the head, and slurred speech.  She administered a mini-mental status examination, on which Carroll scored a 26, which is on the borderline of normal and abnormal.  Gibson also administered a Burns Depression Checklist, a Burns Anxiety Inventory, and an Amen General Symptoms Checklist.  Gibson opined that Carroll was "most likely unable to work" pending the results of neurological tests.

On August 22, 2000, Carroll was examined by Dr. John Wang, a neurologist, who recommended a spinal tap and a full neuropsychological assessment, along with a psychiatry consult.

---

[2]     Gibson is referred to at times as Debbie, and at times as Olivia, but both references appear to relate to the same counselor.

On September 11, 2000, Kenneth Dawes, a doctor of psychology employed by Kemper, reviewed the medical records provided to Kemper by Gibson and Dr. Nadella.  Dr. Dawes concluded that the records did not objectively support a finding that Carroll was disabled from any occupation from a mental health standpoint.  On September 12, 2000, Gerald Goldberg, a neurologist employed by Kemper, reviewed the records supplied to Kemper from Dr. Nadella and Dr. Wang and concluded that the records did not provide objective support for the assertion that Carroll was disabled from any occupation.

On or about September 19, 2000, Kemper notified Carroll that her appeal had been considered and that Kemper maintained its position that her application for benefits was due to be denied. Carroll told Kemper that she had retained an attorney.

By letter dated September 19, 2000, Kemper notified Carroll in writing of the denial of the appeal and stated that she had 60 days in which to appeal the denial by filing a second-level appeal.  She also was informed that she could provide additional documentation to support her claim for benefits.  On September 21, 2000, Carroll's attorney contacted Kemper.  Kemper responded, stating that it would treat his letter as a request for a second-level appeal, and that a decision would be reached within 60 days.

On September 28, 2000, Carroll was examined by Thomas Boll, a doctor of psychology, who stated that Carroll had undergone a neuropsychological evaluation and that Carroll was "severely depressed" and described in detail Carroll's complaints and behavior. Dr. Boll concluded that Carroll would not be able to "carry out her duties" at work, but that her prognosis may improve with therapy. On October 27, 2000, another psychologist, James Crowder, also examined Carroll, finding that she suffered from major depression and was "not able to sustain concentration and attention to tasks required in a work setting."

On November 15, 2000, Kemper notified Carroll that she had failed to submit any new evidence that would support a change in Kemper's position regarding the denial of benefits. The next day, Carroll's attorney sent Kemper the reports of Drs. Boll and Crowder. On November 27, 2000, BellSouth notified Kemper that it had been informed that Carroll had been hospitalized for depression since November 20, 2000. Kemper approved STD benefits to Carroll, effective the date of her hospitalization. Her treating psychiatrist at the hospital filled out a form that indicated Carroll was unable to work at all until February 1, 2001. He further indicated that the February date was subject to change pursuant to out-patient evaluations.

13

BellSouth notified Carroll that, because her claim had been denied and because she had no remaining leave, she must return to work on December 11, 2000, or be terminated.  Carroll returned to BellSouth on December 11, 2000, and Kemper awarded STD benefits to plaintiff from November 20, 2000, to December 10, 2000.  On December 12, 2000, Carroll's supervisor reported that Carroll had left work in the middle of the day on December 11.  Kemper extended Carroll's benefits to December 29, 2000, but notified Carroll's parents that Kemper required an update on her status no later than December 26, 2000.

On December 14, 2000, Dr. Dawes reviewed the medical reports of Drs. Boll and Crowder.  He stated that it appeared that plaintiff was able to perform some type of work, but not her usual duties as a customer service representative.  On December 21, 2000, Kemper notified Carroll that it had performed additional reviews of Carroll's medical records.  On the same date, Carroll was evaluated by Amanda Mumford, a psychiatrist, who concluded that Carroll was experiencing depression.  Dr. Mumford's report was not provided to Kemper until January 22, 2001.

On or about December 27, 2000, Carroll applied for disability benefits with the Social Security Administration.  On December 29, 2000, Kemper extended Carroll's STD benefits until January 5, 2001. While awaiting additional medical records from Carroll's doctors,

Kemper again extended her STD benefits to January 15, 2001, and again until January 25, 2001.

On January 24, 2001, Kemper received reports from Dr. Mumford, and it concluded that the reports supported the claim for STD benefits, and extended the benefits through February 23, 2001. Subsequently, Kemper again extended the benefits through April 10, 2001.

On April 20, 2001, and on May 1, 2001, Carroll was examined by a psychologist, Donald Waters, who concluded that Carroll had "only modest limitations in her cognitive functioning." Waters' report was examined by Lawrence Burstein, a psychologist employed by Kemper, who concluded that Carroll was able to perform some work at that time. Carroll was notified on May 18, 2001, that her claim for STD benefits would be denied effective April 11, 2001.

On May 23, 2001, an attorney acting on behalf of Carroll filed an appeal from the April denial. Carroll returned to work on May 25, 2001, but left work again on May 29, 2001. On May 30, 2001, Kemper received a report from Peggy O'Steen, a therapist, who noted that Carroll still had problems with concentration, steadiness, and energy level, and was "not functioning well enough at this time to return to work." Kemper maintained its position regarding denial of benefits on the basis that O'Steen did not provide objective findings supporting disability.

On June 25, 2001, Dr. Mumford sent Kemper a letter which reported that Carroll had not been released to work and was "only minimally improved." She reported that Carroll's score on a Global Assessment of Function was 45-50, which signifies at least moderate impairment for occupational and social functioning. Plaintiff's attorney also notified Kemper that Social Security had found Carroll to be disabled as of June 9, 2000. Counsel subsequently notified Kemper that Carroll was appealing the decision to terminate benefits.

On October 9, 2001, Kemper psychologist Dr. Burstein reviewed the records provided by Carroll in support of the appeal. He concluded that the records did not support a finding that Carroll was unable to work, and Kemper notified Carroll's attorney on October 10, 2001, that the appeal was denied.

On November 29, 2001, plaintiff's counsel submitted more records, this time from Dr. David Longmire, a doctor who diagnosed Carroll as having suffered a series of "mini-strokes" in June 2001. Counsel requested that the letter be deemed a second-level appeal.

On January 22, 2002, Vaughn Cohan, a neurologist employed by Kemper, reviewed Carroll's records and concluded that the records failed to support a finding that Carroll was disabled from all work. Kemper then upheld its determination and denied the second-level appeal.

16

On February 8, 2002, plaintiff's counsel inquired into the availability of long term disability benefits for the plaintiff. Kemper informed plaintiff's counsel that BellSouth's LTD plan provided for long-term disability benefits only after an employee had received 52 weeks of benefits from the STD plan.  As of that date, Carroll had received STD benefits from November 20, 2000, to December 10, 2000, and from December 12, 2000, to April 10, 2001, a total of approximately 20 weeks.

On March 29, 2002, Carroll filed a complaint in the Circuit Court of Colbert County, Alabama.  The case was removed to this court on the basis that plaintiff's claims arose under ERISA.

## III. DISCUSSION

At issue are the defendants' decisions to deny benefits to the plaintiff under BellSouth's STD and LTD.  It is undisputed that the denial was based on a finding that Carroll failed to demonstrate that she was disabled from performing *any* type of work whatsoever. The parties do not dispute that Carroll provided evidence that she was disabled from performing her job at BellSouth.  Defendants admit they never identified (or attempted to identify) any other job at BellSouth, or any job outside BellSouth that required similar skills or functions, that Carroll was able to do. Defendants employed a standard that Carroll could not be eligible

17

for disability benefits under the STD[3] so long as she was capable of performing any work of any kind whatsoever for any employer.

A.  ERISA Review Standard

Initially, the court must determine the proper standard of review for the interpretation of the plan.  As a general rule, the denial of ERISA benefits is subject to *de novo* review, unless the plan gives the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989).  If the plan gives that discretion to the administrator, the standard of review becomes an "arbitrary and capricious" standard.  Id.  Under the arbitrary and capricious standard, the court must determine "whether there was a reasonable basis for the decision [to deny benefits], based on the facts as known to the [fiduciary] at the time the decision was made.  Brown v. Blue Cross And Blue Shield, 898 F.2d 1556, 1559 (11th Cir. 1990), *cert. denied*, 498 U.S. 1040, 111 S. Ct. 712, 112 L. Ed. 2d 201 (1991), quoting Jett v. Blue Cross & Blue Shield, 890 F.2d 1137, 1139 (11th Cir. 1989).  If, however, the fiduciary acts under a conflict of interest, in which the decision allowing

---

[3]     Because eligibility for benefits under the LTD are contingent upon receipt of STD benefits for 52 weeks, the court need only examine the denial of STD benefits.

benefits to the participant is at odds with the fiduciary's own financial interests, the court employs a heightened standard in which the burden shifts to the administrator to show that the interpretation of the plan was not tainted by self-interest.  <u>Lee v. Blue Cross/Blue Shield</u>, 10 F.3d 1547, 1552 (11th Cir. 1994).

The defendants argue that Kemper has the requisite discretionary authority and that the "arbitrary and capricious" standard applies in this case.  Plaintiff argues that BellSouth retains control over Kemper's decision-making process and that Kemper is not a neutral third party as envisioned by the prevailing legal standard.  Accordingly, plaintiff asserts, Kemper has a conflict of interest so as to trigger the heightened "arbitrary and capricious" standard of review.

The first question for the court is whether the discretion BellSouth has given to Kemper is sufficient to trigger the "arbitrary and capricious" standard.  The parties do not dispute, and the court agrees, that Kemper has discretionary authority to review claims and construe the terms of the plan, so that the court must apply - at least - the arbitrary and capricious standard.

The court next must examine whether Kemper has a conflict of interest such that its denial of Carroll's claim must be reviewed under a heightened standard.  <u>See generally</u>, <u>Cagle v. Bruner</u>, 112 F.3d 1510 (11th Cir. 1997), <u>reh'g and reh'g <i>en banc</i> denied</u>, 124 F.3d

223 (11th Cir. 1997).  The language of the plan in the instant case states that Kemper "shall have discretionary authority to determine whether or to what extent participants are eligible for benefits and to construe disputed or doubtful plan terms."  Defendants argue that the existence of that language necessarily implicates the "arbitrary and capricious" standard, citing <u>Muskett v. BellSouth Telecommunications Inc.</u>, CV 99-C-2796-S (N.D. Ala. March 27, 2002). Plaintiff argues that the standard must be heightened because BellSouth exerts controls over the manner in which Kemper processes claims, and Kemper is not a neutral third-party administrator.  She cites the opinion in <u>Wright v. BellSouth Telecommunications Inc.</u>, CV 01-AR-2213-S (N.D. Ala. Oct. 10, 2002), which calls Kemper's relation with BellSouth a "sham designation."  Although the court is inclined to find that Kemper did not have the type of conflict of interest that was addressed by the courts in applying the

heightened standard,[4] the court finds that it need not reach this determination to resolve the issues at hand.

As discussed below, the court finds that the plaintiff has presented a genuine issue of material fact as to whether defendants' denial of benefits to her was proper under either the arbitrary and capricious standard or the heightened arbitrary and capricious standard, because Kemper and BellSouth employed a definition of disability that simply does not comport with the definition of disability provided in the plain language of the plan documents. Therefore, assuming without deciding that defendants are entitled to the less stringent arbitrary and capricious

---

[4]     See, e.g., Brown v. Blue Cross and Blue Shield, 898 F.2d 1556, 1561-64 (11th Cir. 1990), and cases cited therein (discussing the conflict that often arises when an insurance company both acts as fiduciary and pays benefits from its own assets rather than from a trust or pool, and noting that the standard generally can be viewed as a "range" rather than a "point"). Assuming Kemper acted truly independently of BellSouth, the mere fact that BellSouth paid Kemper a fee to administer the STD and LTD programs does put Kemper into such a conflict of interest as to trigger the heightened standard. The assumption that Kemper acted completely independently of BellSouth, however, may be suspect, given the express retention by BellSouth of the right to dictate to Kemper the manner in which terms of the plan may be construed. If the power to interpret the plan really rests with BellSouth, not Kemper, and it is BellSouth that is paying benefits from its assets, a conflict of interest may exist between BellSouth's own financial interests and its duty to administer the plan for the benefit of the participants. Nonetheless, because the court believes Kemper (and BellSouth) incorrectly and unreasonably construed the definition of "disability," the case can be resolved on the ordinary arbitrary and capricious standard, without attempting to address the heightened standard.

standard, the court finds that the defendants acted in an arbitrary and capricious manner by employing a definition of "disability" that is more restrictive to potential beneficiaries than is called for by the plan documents.

Under the deferential "arbitrary and capricious" standard, the court may not substitute its judgment for that of the administrator, unless the administrator's determination is "arbitrary." The first step in the process is for the court to reach its own determination whether the administrator's interpretation of the plan is "wrong." HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001). In doing so, ambiguities in the plan document are construed against the drafter, usually the administrator or plan sponsor. Id. at 994 n. 24 ("[T]he principle of contra proferentem requires that ambiguities be construed against the drafter of a document; as such, the claimant's interpretation is viewed as correct"). Next, "[i]f the court determines that the claims administrator's interpretation is 'wrong,' the court then proceeds to decide whether 'the claimant has proposed a "reasonable" interpretation of the plan.' Lee v. Blue Cross/Blue Shield, 10 F.3d 1547, 1550 (11th Cir. 1994)." Id. at 994. But even if the claimant's interpretation is reasonable, it still must be shown

22

that the administrator's is unreasonable.  The court of appeals has
explained:

> To find a claims administrator's interpretation arbitrary
> and capricious, the court must overcome the principle of
> trust law [footnote omitted] which states that a
> trustee's interpretation will not be disturbed if it is
> reasonable. <u>See</u> <u>Firestone</u>, 489 U.S. at 110-11, 109 S.Ct.
> at 954 (explaining that when a trustee is granted
> discretion his interpretation will not be disturbed if it
> is reasonable).  Thus, the next step requires the court
> to determine whether the claims administrator's wrong
> interpretation is nonetheless reasonable.  If the court
> determines that the claims administrator's wrong
> interpretation is reasonable, then this wrong but
> reasonable interpretation is entitled to deference even
> though the claimant's interpretation is also reasonable.

<u>Id.</u> at 994.

Applying this process to the evidence and facts in the instant
case, the court is persuaded that defendants' interpretation of the
plan definition of "disability" not only is wrong, but also
unreasonable and arbitrary.


B.  "Disability"

It is undisputed that Carroll's benefits were denied because
the defendants found she was not disabled under a specific
definition of "disability" that required a showing by objective
evidence that Carroll was unable to perform *any* work of *any* kind,
without regard to the skill involved or the remuneration

23

available.[5]   When   asked   during   discovery   whether   this interpretation of "disability" meant that a participant in the STD was   not   disabled   as   long   as   she   could   work   selling   peanuts   or pencils[6] on   the   sidewalk   or   as   a   Wal-Mart   greeter,   defendants agreed   that   it   did.     The   determination   of   "disability"   did   not measure the employee's ability to perform her usual job or another job of comparable skill; rather, disability existed only if she could perform no work whatsoever.

At   the   outset,   this   stringent   definition   of   disability   is simply   inconsistent   with   the   plain   language   of   the   STD   plan document.     As   quoted   above,   the   definition   consists   of   three sentences,   the   first   defining   "disability"   as   being   unable   to perform "any type of work."  If the plan truly intended to impose such   a   strict   standard,   the   definition   could   have   ended   there. Instead, it goes on to say that "any type of work" includes[7] "the

---

[5]   See Declaration of Crystal Miller, dated January 16, 2003; Deposition   of   Joyce   Cote,   p.   13;   Deposition   of   Crystal   Miller, pp. 15-16; Plaintiff's Exhibit 9, File Memo of Dr. Robert K. Dawes, dated   December   11,   2000;   Deposition   of   Dr.   Lawrence   Stephen Burstein,   pp.   17-18;   Deposition   of   Marisol   Vega,   pp.   13-14; Defendant's Summary Judgment Reply Brief, Doc. 36.

[6]   See Deposition of Crystal Miller, pp. 10-11.

[7]   The court is persuaded that, to the extent the use of the word "includes" rather than "means" causes the plan definition to be ambiguous, the rule of contra proferentem requires construing the   language   against   the   sponsor   and   administrator,   BellSouth. Doing so, the second sentence of the definition clearly has the effect of narrowing the definition of disability to something much

24

Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties." Finally, it further defines "A Participating Company job" as "any job within a Participating Company; or any job outside a Participating Company which is comparable in skills and function." Under this definition, a participant need not be completely unable to do anything in order to be disabled. Rather, the participant must be unable to do her "regular job" with or without accommodations, or "another Participating Company job" with or without accommodations, or "temporary modified duties," or a job outside a Participating Company with comparable skills and function.

In <u>Brown v. Blue Cross and Blue Shield</u>, the Eleventh Circuit Court of Appeals noted that, as a general rule, the terms of a plan should be construed in favor of the employees seeking benefits, because the employer establishes the plan to encourage continued employment through a promise of benefits. 898 F.2d at 1569, citing <u>Bonar v. Barnett Bank</u>, 488 F. Supp. 365, 369 (M.D. Fla 1980). In this case, BellSouth has promised its employees that disability benefits will be available pursuant to the plan when they are unable to perform their own job, any job within a BellSouth

---

less stringent than "any work" whatsoever.

25

company, or any job outside of BellSouth that requires similar skills or functions.

The interpretation of the definition of "disability" used by defendants was simply "wrong." Although defendants read the first sentence, they failed entirely to address the complete definition, which places substantial limits on the scope of the "any type of work" phrase in the first sentence. Under this definition, STD benefits cannot be denied simply because the claimant could work selling peanuts or pencils, unless such work involves comparable skills and functions to that which the claimant performed for BellSouth. Insofar as the defendants determined plaintiff's eligibility for STD benefits using the "any type of work" standard, they were simply wrong in their construction of the plan.

The Eleventh Circuit Court of Appeals addressed a similar situation in Helms v. Monsanto Co., 728 F.2d 1416, 1420 (11th Cir. 1984). The court there reviewed the district court's entry of declaratory judgment in favor of the employer in a case brought by a Monsanto lab technician who had been denied disability benefits after contracting an illness that impaired vision and led to total blindness. Id. at 1417-18. Helms' benefits were denied on the basis that medical experts found that Helms was not "totally disabled" within the meaning of the plan. The plan defined total disability as being "prevented ... from engaging in any occupation

or employment for remuneration or profit." Id. at 1418. The medical expert who reached the final decision to deny benefits testified that he believed the plaintiff was disabled, but that he "really couldn't think of any disability compatible with conscious life" that would render a worker disabled under the policy language. Id. at 1419. The district court applied the less stringent arbitrary and capricious standard and found that Monsanto properly denied benefits to Helms. The appellate court reversed and remanded, stating that the denial of benefits was determined by applying the wrong standard.

The court of appeals explained in Helms that a standard defining disability as the inability to perform any work for remuneration must not be taken literally, because "a person would almost never be deprived of the ability to earn a nominal sum unless he is rendered completely immobile and without any cognitive ability." Applying such a rigid standard would render the definition of disability meaningless because it would be virtually synonymous with death. The court wrote:

> Common knowledge of the occupations in the lives of men and women teach us that there is scarcely any kind of disability that prevents them from following some vocation or other, except in cases of complete mental incapacity. Although the achievements of disabled persons have been remarkable, we will not adopt a strict, literal construction of such a provision which would deny benefits to the disabled if he should engage in some minimal occupation, such as selling peanuts or pencils,

27

which would yield only a pittance.  The insured is not to be deemed "able" merely because it is shown that he could perform some task.

Helms v. Monsanto Co., Inc. 728 F.2d 1416, 1421 (11th Cir. 1984).

The court first notes that Helms differs from the instant case in that the definition of disability employed by Monsanto was the same definition as that contained in its plan documents.  In Carroll's case, the definition used by BellSouth and foisted upon Kemper by BellSouth is not the definition set forth in the plan documents, but a much more rigid one.  If anything, the definition applied by Kemper and BellSouth is even more rigid than that rejected in Helms.  At least in Helms, the claimant was deemed disabled only if unable to work for remuneration; the definition used by these defendants would deny benefits if the claimant can do anything, whether remunerative or not.  Such a definition is too stringent and makes the STD plan virtually meaningless.[8]

_____

[8]     Consider this scenario.  Not only would the erroneous definition used by defendants deny benefits if the claimant could sell peanuts or pencils, but also if the claimant is physically and mentally "able" to work as a brain surgeon or a corporate CEO or a novelist.  Under defendants' definition, the work a person is "able" to perform is not measured by the claimant's skills, experience, education, or training, but simply by what the person is physically and mentally "able" to do.  Thus, by that reading, virtually no one short of being comatose is ever disabled because there will almost always be a job that is so minimally taxing physically or mentally that almost anyone is "able" to do it.

In <u>Helms</u>, Monsanto's definition stated that a total disability required that the employee be "prevented ... from engaging in any occupation or employment for remuneration or profit (as determined by the Corporation)."  BellSouth's plan uses the phrase "any type of work," but limits the definition by further describing the phrase in terms of the employee's regular job and others comparable to it.  The STD further defines a "participating company job" as "any job within a participating company; or *any job outside a participating company which is comparable in skills and functions*." Such delineation of jobs clearly indicates that a job not comparable in skills and functions, such as selling pencils on the street corner or being a brain surgeon or a corporate CEO, is not "work" within the meaning of the STD plan documents.

Having determined that the defendants' interpretation of the STD plan was "wrong," the court also finds that plaintiff's construction of it is reasonable.  She argues that a person is disabled under the plan if mentally or physically unable to perform her usual job, another job within BellSouth, or a job outside BellSouth involving comparable skills and function.  This construction virtually tracts the plan language itself and reasonably takes into account the real life experiences of disability in employment.

Finally, the court also is persuaded that defendants' interpretation is not only wrong, but arbitrary and capricious. It fails to utilize the complete definition of disability, disregarding those parts of the definition that narrow the scope of the expansive "any type of work" standard used by defendants. It has been noted that any employer's interpretation of the plan "that contradicts the clear wording of the [plan] has to be arbitrary and capricious." Fulmer v. Connors, 665 F. Supp. 1472, 1489 (N.D. Ala. 1987). In Helms, the court found that the plan's implementation of its definition of "any work" was contrary to the purposes of ERISA and could not be upheld,[9] even though the definition employed was the same as the definition set forth in the plan documents. In light of that determination, this court finds that the defendants' use of a definition of "any work" that is more restrictive than the definition used in the plan must be deemed arbitrary and capricious.

Furthermore, it has been held that when the defendants never actually analyze the requirements set forth in their own plan, their decision must be deemed arbitrary and capricious. See

---

[9]    The Helms court cited legislative history for the proposition that "Congress wanted to assure that those who participate in the plans actually receive the benefits they are entitled to and do not lose these as a result of unduly restrictive provisions or lack of sufficient funds." Id. at 1420, citing H.R. Rep. No. 93-807, 93rd Cong., 2nd Sess. 3, reprinted in 1974 U.S. Code Cong. & Ad. News 4639, 4670, 4676-77.

<u>Florence Nightingale Nursing Services Inc. v. Blue Cross/Blue Shield</u>, 41 F.3d 1476, 1484 (11th Cir. 1995), <u>cert. denied</u>, 514 U.S. 1128, 115 S. Ct. 2002, 131 L. Ed. 2d 1003 (1995).  In <u>Florence Nightingale</u>, the defendant never addressed the elements of "medically necessary" care that were spelled out in the plan.  <u>Id</u>.  The court held that the decision reached regarding whether the care was medically necessary was, therefore, arbitrary and capricious.  In this case, the defendants admit in depositions that they did not consider whether Carroll was able to perform a job within BellSouth, or a job outside BellSouth that required the "same skills and functions" as required in the plan.  For these reasons, the decision by defendants to deny Carroll's disability claims must be deemed arbitrary and capricious.  Defendants' motion for summary judgment will be denied.

### C.  Plaintiff's Motion for Summary Judgment

Plaintiff also has filed a motion for summary judgment and, though the court agrees that defendants' used an arbitrary and capricious standard to deny plaintiff STD benefits, the court cannot agree that plaintiff is entitled to a judgment *as a matter of law* awarding her short term and long term disability benefits.  For two reasons, the court believes it would be proper to remand this matter to the claims administrator for a new determination of

plaintiff's eligibility for short term and long term disability. First, because defendants used the wrong definition of disability to make the first assessment, the administrator should be given the opportunity to review the evidence in light of the correct definition. Second, even assuming that plaintiff meets the definition of short term disability, her claim for long term disability requires a constant assessment of her condition and circumstances to determine whether, at some point, she might become able to work again. This reassessment should be done by the claims administrator, not the court.

As a general rule, once a court determines that the administrator has denied benefits arbitrarily, the correct remedy is to remand the matter to the administrator for a new review and determination of the evidence. See Levinson v. Reliance Standard Life Insurance Co., 245 F.3d 1321, 1330 (11th Cir. 2001)("We agree that, as a general rule, remand to the plan fiduciary is the appropriate remedy when the plan administrator has not had an opportunity to consider evidence on an issue"); Jett v. Blue Cross and Blue Shield of Alabama, Inc., 890 F.2d 1137 (11th Cir. 1989). That remedy seems particularly apt in this case, where, because the wrong definition of disability was used, the claims administrator has not conducted a meaningful review of the evidence. Viewing the evidence in the correct light, rather than the almost impossible

32

standard of being unable to perform "any type of work," may cause the claims administrator to conclude that plaintiff indeed is entitled to benefits.  In short, the definition used was so wrong, the review was essentially meaningless.

Further, plaintiff also claims an entitlement to long term disability benefits.  It is quite clear that these benefits were denied because plaintiff was deemed unable to meet the stringent definition of short term disability for the requisite number of weeks.  A new review of the short term disability claim, using the correct definition of disability, may result in a finding that plaintiff has been disabled for the requisite number of weeks to qualify for long term disability.  The long term disability is so dependent upon a determination of short term disability that it too must be remanded for reconsideration along with reconsideration of plaintiff's short term disability claim.  Also, even assuming plaintiff meets the requisite standard for short term disability, the continuing obligation to assess her disability falls to the administrator to determine whether she might have improved to the point of no longer being disabled.

Plaintiff's motion for summary judgment is therefore also due to be denied.  The case will be remanded to the claims administrator, Kemper, for a new determination of plaintiff's

claims, using the correct definition of "disability" explained above.

## IV. CONCLUSION

Based on the foregoing undisputed facts and legal conclusions, both motions for summary judgment, the one filed jointly by defendants (court document #25) and the one filed by the plaintiff (court document #28) are due to be denied.  A separate order will be entered contemporaneously herewith, denying both motions and remanding the case to the administrator for a new determination of plaintiff's claims.

The Clerk is DIRECTED to serve a copy of this memorandum opinion upon counsel for all parties.

DATED this 27ᵗʰ day of August, 2003.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE